# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 20, 2019 Session

## IN RE E.Z., ET AL.

### Appeal from the Circuit Court for Knox County
### No. 140538, 140537     Gregory S. McMillan, Judge

_____

### No. E2018-00930-COA-R3-JV
_____

This appeal arises from a finding of dependency and neglect. S.Z. ("Mother") is the mother of both E.Z. and B.G. ("the Children," collectively). C.G. ("Father") is the father of B.G.[1] In the wake of certain non-accidental injuries sustained by B.G., Father's father filed a petition seeking custody of the Children. The Tennessee Department of Children's Services ("DCS") intervened, and the Children's maternal grandfather filed a petition, as well. Mother and Father both denied abusing B.G. The Circuit Court for Knox County ("the Trial Court") found the Children dependent and neglected. The Trial Court found also that Mother or Father abused B.G. and the other parent knows who committed the abuse, but the Trial Court held it could not determine which parent committed the abuse. Consequently, the Trial Court declined to find severe child abuse. DCS appeals to this Court, and Mother raises additional issues. We find, *inter alia*, that the evidence does not preponderate against the Trial Court's factual finding that Mother or Father abused B.G. and the other knows who committed the abuse. Given that and other findings, we hold that the Trial Court erred in concluding that it could not find severe child abuse. We, therefore, reverse that aspect of the Trial Court's judgment and hold that severe child abuse was proven by clear and convincing evidence. In all other respects, we affirm the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed, in Part, and Reversed, in Part; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

_____

[1] Due to the extraordinarily sensitive character of this juvenile case, we have initialized the names of the Children and their family members.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; and Jordan K. Crews, Assistant Attorney General, for the appellant, the Tennessee Department of Children's Services.

Gregory H. Harrison, Knoxville, Tennessee, for the appellee, S.Z.

Jerrold L. Becker, Knoxville, Tennessee, for the appellees, J.Z. and C.Z.

Emily B. Vowell, Knoxville, Tennessee, for the appellees, J.G. and S.G.

## OPINION

## Background

B.G. was born in February 2016. Mother has another child, E.Z., who was born in October 2014. E.Z.'s father played no role in this case. Father has no legal or biological tie to E.Z. The abuse perpetrated against B.G. occurred over the first few months of his young life in the first half of 2016.

On May 4, 2016, Mother took B.G. to the doctor after B.G.'s daycare informed her that blood was found in his diaper. The doctor found bruising on B.G.'s penis. Acting on the doctor's referral, B.G. received a head ultrasound and skeletal survey at Children's Hospital. These scans yielded nothing unusual at the time. On June 2, 2016, B.G. underwent surgery for an anal fistula condition.

On June 13, 2016, B.G.'s daycare notified Mother that blood was found at the tip of B.G.'s bottle. Mother and Father took B.G. to the doctor. The doctor determined that B.G. had a torn frenulum—the small piece of tissue connecting the lip to the gum. B.G. underwent another head ultrasound and skeletal survey. Again, nothing unusual was shown. However, this time, a pediatric radiologist reexamined the results overnight and discovered two fractures in B.G.'s left leg. B.G. was released, and the parents were told to bring him back in two weeks for another skeletal survey to assess how his bones were healing. At no point did Mother or Father offer any definitive explanation for B.G.'s injuries. Meanwhile, Mother continued to take B.G. to his normal daycare. A June 24, 2016 skeletal survey on B.G. revealed a posterior rib fracture.

At this juncture, DCS issued an Immediate Protection Agreement granting paternal grandfather and paternal step-grandmother J.G. and S.G. ("Paternal Grandparents") custody of the Children. Custody of E.Z. later was granted to maternal grandfather and maternal step-grandmother J.Z. and C.Z. ("Maternal Grandparents"). On June 30, 2016, the paternal grandfather filed a petition in the Juvenile Court for Knox

-2-

County ("the Juvenile Court") seeking legal custody and care of the Children. DCS intervened, and the maternal grandfather filed his own petition. The Juvenile Court found the Children dependent and neglected, and that B.G. was subjected to severe child abuse. Mother and Father appealed the Juvenile Court's judgment to the Trial Court.

In March 2018, a de novo hearing was conducted before the Trial Court. Dr. Marymer Perales ("Dr. Perales"), a pediatrician at Children's Hospital, was consulted on B.G.'s case. Dr. Perales testified regarding B.G.'s litany of injuries and offered her medical opinion that these were non-accidental in origin. We quote now a portion of Dr. Perales' extensive testimony as to B.G.'s injuries:

> Q. The frenulum tear. What is the concern? We got a little bit into it earlier, but what is the concern for a frenulum tear in a child that young?
> A. A frenulum tear is one of those things that we look for when we do an evaluation for trauma. So let's say a patient presents to me for any other concerns of abuse or neglect, one of the things that is odd to us is a frenulum tear, so we always look for that. We know that it is highly correlated with inflicted trauma, particularly if a child is non mobile, as [B.G.] is. He's three and a half months old and he is not crawling and he's not going to stand and he's definitely not walking. So a three-and-a-half-month-old who may or may not be going to be rolling over, should be watched very carefully, and a frenulum tear, someone should know when and how he received that, and there was no history to explain that injury. That's the concern of inflicted trauma.
> Q. Did anybody note any bleeding?
> A. Yes. It was noted in the 6-13 medical record that mom had told that physician that she had noticed some bleeding on the gums, and it's also noted in the PCP record that there had been some bleeding with the gums.
> Q. At three and a half months old, could [B.G.] roll over at that age?
> A. He might have been able to, yes. I don't know if he could, but he might have been able to.
> Q. Would he have been able to crawl?
> A. No.
> Q. So the likelihood of it being accidental trauma in that case would be -- would it have been less?
> A. It would be less, yes. And the fact that a three-and-a-half-month-old should be monitored at all times, someone should have known what happened to him.

***

-3-

Q. On 6-14 the scans are reevaluated and it turns out we have fractures?
A. Correct.
Q. In the leg. The child went home with the parents that day as well?
A. Correct.
Q. Did you have concerns about that?
A. Yes. Both Dr. Abrams and I discussed with DCS and law enforcement that we understood that there was a lot of people that were around this child all the time, but that we had concerns that if he went right back into the environment where these injuries occurred, that he would get re-hurt.
Q. Why were you concerned other than there were multiple people that could have had access to the child?
A. Because at that point I did feel that given the totality of [B.G.]'s injuries, that he had been hurt more than once and that there is no explanation for any of these injuries.
Q. Okay. The fractures, I want to talk about the fractures that you mentioned. Are those fractures consistent with any kind of mechanism of injury or any other explanation that you were offered?
A. So when I see metaphyseal fractures in any infant or child, and I'm hearing a possible mechanism to that injury, I look for and listen for anything that is consistent with a pulling or twisting injury to help me identify if that history is consistent with those findings. That being given, that I think that this child's bones are normal on x-ray and that his labs are otherwise normal, which [B.G.]'s were.
Q. By pulling or twisting, you're talking about someone else doing the pulling or twisting; is that correct?
A. At three and a half months old, yes, that would be somebody else would have to be doing the pulling or twisting.
Q. That would have been to his leg?
A. Yes. And he would not have enough weight to sustain him getting caught in something, just getting metaphyseal fractures.
Q. After the June 14th interaction, the visit to the Children's Hospital, what happened next with [B.G.]?
A. He was re-seen in the emergency room on June 24th.
Q. Did the parents leave with any recommendations on June 14th?
A. Yes. He was supposed to get a repeat skeletal survey in two weeks.

***

Q. What about the metaphyseal fractures, what are we talking about?
A. Those are a little bit harder to date.
Q. Is it because they don't heal the same way?

-4-

A. They don't always, yes.

Q. You said the tenth rib fracture on the right side; is that right?

A. Correct.

Q. Is there a mechanism of injury associated with that type of injury?

A. Rib fractures, usually you have to have some kind of squeezing to the chest mechanism. That could be any way that the chest could be squeezed.

Q. Could it be caused by something like swaddling?

A. So swaddling was something that was discussed a lot, how this child was swaddled. Swaddling is something that happens everyday in our NICUs in our hospitals, every medical provider is taught how to swaddle. And even when we look at all of the differential diagnoses for what can cause many things and mimics many things, swaddling is not one of those things that comes up. So it is not one thing that I think caused these rib fractures. Now, if this rib fracture was the only thing this child had, I would consider it more closely, but it's not. We have many injuries with many mechanisms and different timeframes.

Q. We just talked about the mechanism of squeezing.

A. Okay.

Q. Can you describe that, what you're really talking about?

A. It's been described, for example, in shaken baby syndrome where you squeeze the chest. It's been described with CPR, again, where you would squeeze the chest. It's been described with crush injuries, again, where you would squeeze the chest. So anything -- and if I had a history and I was listening to that, I would be listening for something that I would think would be consistent with the chest being squeezed.

Q. Any explanation for this rib injury given?

A. No.

Mother testified to the allegations of abuse. Mother denied abusing B.G. and offered no explanation for what happened. Mother stated, in part, as follows:

Q. What were you doing on June 14th?

A. [A]n officer came to our house and asked if we would take [B.G.] back. They called and asked to bring him, that they had found something on the x-ray.

Q. What was your understanding about the injury that was bringing you back to the hospital the very next day?

A. They just told me, all they said -- I'm not sure they even told me on the phone, I think they said that there was a fracture. So when we got there, they said that it was the tibia and fibula.

Q. Femur and tibia?

A. Yes.

Q. The fractured leg?

A. Yes. I thought of a million ways, I don't know how.

Q. That was my next question.

A. Okay, yeah.

Q. I don't mean to cut you off, but do you have any explanation for how [B.G.] could have suffered this injury?

A. No. I have thought about it ever since we went to the hospital that day, and I don't know what they --

Q. Who had been caring for [B.G.] up until June 13th?

A. Everyone, and --

Q. Now, who is every one?

A. Me, [Father], my parents. His [Paternal Grandparents] kept him overnight one night. [Father's mother] came, I think she watched him maybe a couple of hours in that timeframe. The time that this happened as far as who watched him, every single person, grandparent, parent. I didn't -- no friends or -- the daycare and the hospital people, that was it. And the only people I let watch [B.G.] was my parents or his parents and that's it.

Q. Now, you say parents, you're talking about grandparents, you're talking about --

A. The kids' grandparents.

Q. Are you talking about both maternal grandfather and step grandmother on both sides?

A. Yes.

***

Q. We've established there were other caregivers for [B.G.] in your extended family, correct?

A. Yes.

Q. Did you have any concerns about any of those other caregivers?

A. No.

Q. Do you have any concerns today? I'm asking you today, after this case has been going for almost two years, do you have any concerns for any of [B.G.]'s caregivers?

A. No.

Q. Did you continue taking [B.G.] to the daycare after June 14th?

A. He went two days, I think, that week, yes.

Q. That's because you didn't have concerns with the daycare?

A. Yes.

-6-

Mother testified repeatedly that she did not know who caused B.G.'s injuries. Mother testified, among other things, regarding Father's penchant for lying, the state of her relationship with him, and his parenting role with B.G.:

Q. So you have no idea how these injuries could have occurred?
A. I have no idea. The only thing I ever said, you know, when [Father] changed his diapers, he lifted his legs up too high. I told him I don't believe it's necessary to have to lift his legs up that high. We never saw a problem with it again.
Q. Do you have concerns with [Father] and his truthfulness?
A. He's lied to me before.
Q. Tell us about that.
A. It was about his jobs. I don't know, it was when he was in between jobs and he led me to believe that he was still working and he was not.
Q. He lied to you about being employed?
A. Yes.

\*\*\*

Q. Suffice it to say, you were the primary caregiver, suffice it to say?
A. Yes.
Q. Did he ever spend time alone with the children?
A. Yes.
Q. How often?
A. [B.G.], rarely. [E.Z.], he would watch her several times before I even had [B.G.], she had to stay out of daycare or, you know, it was different.
Q. What if you had to run an errand or something, would you leave the kids alone with [Father]?
A. This was [E.Z.]. I rarely ever left him with -- I'm not sure that I left him with both kids. If it was, it was rarely.

\*\*\*

Q. And were you afraid to break up with [Father] once this case started?
A. Oh, absolutely.
Q. Why were you afraid to break up with [Father]?
A. Because his parents have [B.G.], and they've always been concerned about the whole me not letting them see [B.G.] from the beginning, even though I give them no reason to do that, but I feel like when I leave [Father], that's -- I don't know the word for it but...
Q. You and [Father] have remained civil; is that correct?

A. Yes.

Q. Prior to the break up, you were engaging in couples counseling?

A. Yes. We're in it currently.

Q. And has that couples counseling focus changed?

A. No.

Q. Are you doing co-parenting counseling now?

A. No. That's something that we were going to do because regardless of anything, you know, we will have to co-parent.

Continuing her testimony, Mother was questioned about whether Father had anger issues. After some initial equivocating, Mother acknowledged Father had shown anger on occasion, and she testified also that Father took steroids for a period of time. Mother stated:

Q. Okay. You also testified that you've never seen [Father] exhibit anger; is that right?

A. Right, anger ever towards [B.G.]. I mean, I wouldn't say anger issues. I've seen him get upset, yes, I've seen him get upset. Anger issues to me is a whole other thing, you know. I guess based on definition.

Q. All right. So would you consider it having an anger issue or not having an anger issue if [Father] broke your car radio when you told him that he needed to act right or you were going to leave him?

A. That was based on -- yeah, I'd say that's anger.

Q. And that happened, right?

A. Yeah.

Q. How did he break it, did he punch it?

A. He wasn't meaning -- I don't know. Yes, he did. He wasn't meaning to hit that but yes, he hit that.

Q. That was within the past couple months, in January of this year-ish?

A. No, I don't know. I have a new car now, so I haven't had that car for the last three months. That was last year.

Q. Like December?

A. I guess.

Q. So relatively recently?

A. Yes, within the end of last year.

Q. Did you know that [Father] was taking steroids around the time that [B.G.] sustained these injuries?

A. He was not taking steroids at the time that [B.G.] sustained these. He had been off of them for a month, which everyone in this courtroom knows, he had been off of them for a month.

Q. So you did or did not know he was taking them?

A. I did know he was -- when he was off of them, I knew he was taking them. I don't know much about steroids, so he had to explain it to me, but I thought it was a supplement at first for whatever, I never saw him do them, but yes, he told me he was on steroids.

Robin Long ("Ms. Long"), KinderCare worker, testified. Ms. Long managed the daycare where B.G. stayed. Ms. Long testified to a bruise found on B.G.'s leg, and how this was an unusual injury for a child so young to have:

Q. So is a bruise on the leg of a three-and-a-half-month-old more or less concerning than a bruise on the leg of a three-year-old?
A. It's more concerning because they're not mobile.
Q. You said you've been doing this 20 -- how many years?
A. Twenty-five.
Q. How many diapers have you changed?
A. I wish I could put a number on that, I have no idea. A lot.
Q. Thousands?
A. Yes.
Q. Hundreds of thousands?
A. Yeah.
Q. How often do you see bruises in that particular place that was seen on [B.G.]?
A. Not very many.
Q. Have you ever caused a bruise that you know of?
A. Not that I know of.

Kayla Smith, a DCS investigator, testified as to the basis for the severe abuse designation in this case:

Q. So there's nothing that happened at the daycare center that would give rise to a severe abuse designation, correct?
A. Correct.
Q. And basically what gave rise to the severe designation was because there were an unexplained fracture of the child's knee area, and the frenulum being ruptured, correct?
A. The initial report was that there was a torn frenulum, yes.
Q. In your experience, that in itself, have you had cases where because the frenulum was ripped or cut, that that gave rise to severe abuse designations?
A. I usually let the medical professionals tell me in their expert opinion if they view the injuries to be severe or non severe or abuse or accidental.

Q. You make decisions outside of the medical, DCS makes a decision based upon its investigation. What I'm asking you is that have you, in your experience, had situations where in and of itself a frenulum tear would give rise to a severe abuse case?
A. Yes.
Q. That in and of itself?
A. Yes, the tearing of the frenulum is typically, as Dr. Perales said earlier, typical of abuse.
Q. In this situation, you don't know how that occurred?
A. That's correct.
Q. Nor you don't know how the fracture occurred; is that correct?
A. That's correct.
Q. Nor do you know how the rib fracture occurred, correct?
A. That's correct.
Q. And with all the caretakers that saw this child, the person who saw the child the most was [Mother] over here, correct?
A. That's correct.
Q. But other than the time element, there was nobody who you had interviewed that you can point to and say because their particular actions or reactions, this child was injured, correct?
A. Correct.

Jessica Osborne, another DCS investigator, testified to an interview with the parents and their lack of explanation for B.G.'s injuries:

Q. Did the father offer up any explanation for these injuries to [B.G.]?
A. No.
Q. Did you ask him?
A. Yeah.
Q. Did the mother offer up any explanation for these injuries to [B.G.]?
A. She was concerned that maybe something had happened at the daycare, but aside from having any concern, she didn't have anything else to provide.

J.G., B.G.'s paternal grandfather and Father's father, testified as to why he became involved in this matter. J.G. stated, in part:

Q. [I]n June of 2016, what led you to file the petition for dependency and neglect?
A. In June of 2016?
Q. Yes.

A. Well, this is the history with [Father], and I will kind of go back a little bit. He's not been truthful, he has lied on several occasions, and we did have some incidents at the house where he was -- actually he and I at one time, I had to restrain him.
Q. When was that?
A. This would have been when he was in his early 20s. And because of his continuous lying, the fact that I had found out that he had actually stolen something from me and that I had gotten him four to five jobs and he had essentially gotten fired from all of them, I eventually told him that he could not stay at the house any longer. So that's why there's been such a long span. We've still communicated on a basis, I still love him, he is my son, but he's had that history of not being exactly truthful.
Q. So after you found out about the injuries to [B.G.] --
A. Yes.
Q. -- that combined with your knowledge of [Father] and your experience with [Father], your relationship with [Father], did that give you cause for concern?
A. It did give me cause for concern.
Q. Which in turn led you to file the petition for dependency and neglect in Juvenile Court?
A. Yes.

Turning to the present and B.G.'s condition in his care, J.G. testified that the child had incurred some mild injuries while playing but otherwise was healthy and happy. J.G. testified:

Q. That was two years ago. So tell us about two-year-old [B.G.].
A. That was when he was three months old. [B.G.] is -- he lights up the room and he's a joy to have. He's a great kid. He's over two years old now. He stays at the house with myself and [S.]. And, as I've mentioned, I'm part-time, so my schedule is quite flexible, I can pretty much come and go, I'm thankful and fortunate that I can pretty much come and go as I need to from work. I only work about 25 hours a week, so I can take off when I need to. I'm off every Friday with [B.G.].

***

Q. How is he doing developmentally?
A. He is excellent, he's in 90 percentile on height, from that standpoint. His weight, she said he was two pounds overweight, put him on skim milk,

I've already done that. He is healthy, he runs, he plays, he talks, he's just a happy, healthy normal child.

Q. He has met his milestones?

A. Yes, he has.

Q. Education-wise, is he up to where he should be, colors and working on that stuff?

A. Yes.

S.G, J.G.'s wife and B.G.'s paternal step-grandmother, testified as to Mother's and Father's reactions to the legal proceedings:

Q. When you're talking to [Mother] about options for [B.G.], placing options, maybe to avoid long drawn out court proceedings, did she ever make mention of how this would affect her career?

A. Yes. She said that she could not just stop this process and give us permanent custody and us just work out something where we know that [B.G.] is safe because she would not be able to get a job in the medical field if she had a severe abuse finding still on her.

Q. Okay. Now, let's move forward to the fall of 2017. Did [Father] ever tell you anything that was concerning about [Mother] or that he was concerned about [Mother]?

A. On that same day when in court, when I had talked to [Mother] -- and another concern that [Mother] had was that she feels like she's constantly having to make [Father] do the right thing and get his paperwork together and all of that. Then I went and talked [to Father] separately and just said, you know, quit making [Mother] be your mother, get your stuff done, and that's kind of when I stepped in and tried to get all of his paperwork together. So everyday I would send him a text, get this, get this.

Q. You were trying to help him take the steps to finish what the Juvenile Court had ordered him to do?

A. Yes, ma'am. Anyway, so I asked him if he had any concerns with [Mother], and he said that he was just concerned about the emotional distress that all of this was having on her and that he was having . . . .

C.F., Mother's mother, testified that Mother displayed a shocked reaction upon learning of B.G.'s injuries. C.F. stated, in part:

Q. Were you with [Mother] when she found out about the broken bone?

A. Yes, that was me and [Mother], just by ourselves.

Q. What was [Mother]'s reaction?

A. She was shocked, and then she cried. It was heartbreaking to hear something about your child and not know why or how.

Q. Did you ask [Mother] what happened?

A. Yes, of course, and she did not know.

Q. Can you describe how [Mother] kind of deals with things generally?

THE COURT: How what?

Q. Is [Mother] a very emotional person when she gets stressed out, like what is [Mother]'s personality?

A. She internalizes a lot. She's a very smart, intelligent, controlled, but because of that control, she internalizes stuff.

Q. Have you ever known [Mother] to be violent?

A. No.

Q. Have you ever known [Mother] to mistreat [E.Z.] in any way?

A. Never.

Q. Did you ever know [Mother] to mistreat [B.G.] in any way?

A. Never.

Continuing her testimony, C.F. stated the following regarding possible causes for B.G.'s injuries:

Q. Did your daughter tell you that [B.G.]'s frenulum was torn because [E.Z.] had thrown a toy at him?

A. Yes. Well, and I know I've witnessed my granddaughter, in the times she had a pacifier kind of thing where -- pacifiers, bottles. She would go and try to mother [B.G.].

Q. My question was, did [Mother] tell you that [B.G.]'s frenulum was torn because [E.Z.] threw a toy at him?

A. She assumed that's how it could have happened and told me that, yes.

Q. But I thought she told you that she had no idea how it happened; isn't that what you testified to earlier?

A. When we were talking later and trying to figure out what could have happened, that's the only possibility that could have happened.

Q. You testified earlier that she had no idea how his leg got broken. Did she ever -- what were her theories?

A. She didn't have any theories. She still doesn't have any theories.

Q. Did she ever tell you it was broken because [E.Z.] crawled over his leg?

A. No.

Q. What was her theory about the rib fracture?

A. Again, there weren't any -- you know, we've tried to figure out what caused that, but there aren't any -- that's just ideas of what could have happened. We don't know what happened.

-13-

After being the subject of much testimony, Father took the stand to testify himself. Father denied harming B.G. Father testified, in part:

Q. Did you separate from [Mother] or did [Mother] separate from you?
A. It was a mutual agreement.
Q. And you've heard the testimony of this case so far, correct?
A. Yes.
Q. Did you do anything to hurt [B.G.]?
A. Absolutely not.
Q. Have you been physically violent towards [Mother]?
A. No.
Q. We have heard about the radio incident. When did that occur?
A. It says six months ago.
Q. What led up to that argument?
A. It started in the car, and I was driving.
Q. What were you guys arguing about?
A. I think it was about court and the kids.

***

Q. Do you remember there was the issue of a torn frenulum in [B.G.]'s mouth?
A. That was before he went to the hospital, yes.
Q. That issued [sic] was raised with you?
A. Yes.
Q. It's your testimony that you told the doctor you had no idea how the injury occurred?
A. That's right.
Q. This whole -- and it's the way you phrased it, it's the way you phrased it. Your testimony was we couldn't come up with an idea of how it happened. Do you recall testifying to those words?
A. To the doctor.
Q. To the doctor. You couldn't come up with an idea?
A. Yeah.
Q. Is that your way of saying that you had no idea?
A. Yes.
Q. It's not your way of saying you just couldn't come up with an idea?
A. No, it's saying that I didn't --
Q. Or come with an explanation?
A. I didn't have an explanation of how it happened, no.

-14-

Q. So you have admitted steroid use. I want to ask you about that. When we talk about steroids, in your steroid use, what were you using exactly?
A. You want to know specifically?
Q. Yeah. What kind of supplements or steroids were you using?
A. Anabolic steroids.
Q. Anabolic steroids?
A. That's what they are, yes. Well, basically I was using testosterone --
Q. Could you speak up.
A. So normally it was testosterone cipionate and trenbolone acetate and equipoise.
Q. What do these steroids do for you or do to you when you take them?
A. What do they do to you?
Q. Yeah. You're putting these in your body, what do they do?
A. Depends on what you're asking.
Q. Why were you taking them?
A. Just like any other bodybuilder would take steroids.
Q. You're a bodybuilder?
A. Competitively, no, but I plan to be.
Q. You want to be a bodybuilder?
A. Not on a professional level, no.
Q. But it's something you pursue as a hobby?
A. I do enjoy working out, yes, and fitness.

***

Q. Have you ever gotten violent on steroids?
A. No.

M.G., Father's mother and J.G.'s ex-wife, testified in support of Father. As relevant to whether J.G. is a suitable caregiver for B.G., M.G. described her ex-husband's alleged violent tendencies:

Q. [H]ave you ever known of an occasion where Mr. [J.G.] has been violent towards -- well, let me ask you this first, towards you, have there been incidents where Mr. [J.G.] has been violent towards you?
A. Yes.
Q. Tell the Court about that.
A. Well, he just would call me names, and he has a bad temper, he would yell. And there was certain instances during our marriage when it did get physical. There was certain times when it was very hard for me to be there, but I did what I could to keep my family together at the time.

-15-

Q. When you said that it got physical, tell the Court specifically what Mr. [J.G.] would do to cause it to become physical.
A. There was one instance where he pushed me down the stairs, we were in a fight, and then he kicked me when I was laying on the floor and told me to get up. There was another time during one of -- when we were away on a ball trip, we got in another argument and he tried to me push me out of the truck.
Q. He tried to push you out of the truck?
A. Yes.

Maternal grandfather J.Z. testified in support of his daughter, Mother. J.Z. stated, in part:

Q. Now, what is your position today with respect to your daughter [Mother] in terms of the allegations against her relative to child abuse or failure to protect [B.G.]?
A. I see the allegations as unfounded.
Q. Why do you feel like that to be the case?
A. I've got a very close relationship with my daughter, and I don't feel she is capable of harming her children.
Q. You have seen her interact with both children?
A. Yes, sir, I have.
Q. Can you describe to His Honor -- I don't want to repeat the testimony that's gone on, but from your vantage point, what have you seen as her father in terms of her exercising appropriate parental responsibilities for these children?
A. A very strong commitment, as a mother should have.

Testifying further, J.Z. expressed his view that the Children should be re-united:

Q. You and [C.Z.] have been very supportive; is that correct?
A. Yes.
Q. As well as your ex-wife too?
A. Yes.
Q. She's been there as well. As an extended family, not fighting within the family, but as an extended family, do you have any reservations about the commitment and support that you three can make to [Mother] and these children?
A. No, I do not.
Q. Has there ever been any friction of the type that's been testified to between the [G.]s, their son and the father, that exist in your family?

-16-

A. No, sir.

Q. Now, I have asked you if you would be willing to take on both [B.G.] and [E.Z.] into your house with [Mother], you said yes?

A. Yes.

Q. Why do you think it would be in [B.G.]'s best interest for him to be with his sister and his mother on a full-time basis?

A. I mean, I see the relationship that they have together when they're around each other, and I'm convinced --

Q. When you say "they", who is "they"?

A. [Mother], [E.Z.] and [B.G.]. I mean, they love each other, they get along perfectly, and I believe in the family unit.

Q. … [E.Z.] has been allegedly to have been a little rough with [B.G.] at times. Any other time, has she been a big sister to him?

A. Yes, very much.

Q. In what ways, how has she shown that?

A. I mean, throughout the night, we put [E.Z.] down between 6:30, 8:30, depending on how many books she wants to have read to her, but throughout the night -- She's a light sleeper like I am, and she will talk in her sleep, and I will hear [B.G.], I will hear momma, I will hear mommy. I mean, she thinks -- I mean, she talks about [S.G.] and [J.G.] too. I mean, she bonds, and she is bonded with everybody. And it's just, she's honestly, I'm biased, but I think she is the most wonderful girl as a granddaughter, awesome.

As trial winded down, paternal grandfather J.G. returned to the stand to respond to his ex-wife's allegations concerning him:

Q. Do you have any recollection -- or did you ever push her down a flight of stairs?

A. No, I have no recollection of that.

Q. Did you ever attempt to push her out of a moving car?

A. No.

Q. Were you verbally abusive to her?

A. We've had arguments, we've gone and back forth with arguing, possibly verbally abusive, yes.

Continuing his testimony, J.G. acknowledged he at times used harsh disciplinary methods on Father when he was younger:

Q. When did you become physical with your son?

A. I mentioned one occasion where I had to restrain him. There was

-17-

another occasion when he was young where I tried to discipline him, quite honestly, to whip him with a belt on his butt, and he squirmed and I missed and hit him on the back.

Q. Did it leave marks?

A. Yes, it did leave a mark.

Q. Was there a time when you and [Father] went fishing and got in a fist fight?

A. There was a time that [Father] and I went fishing.

Q. Did you get in a fist fight?

A. We went fishing and we went with a friend of mine and my youngest son, and we were on the rocks on the river, and [Father] -- I made the comment -- my friend asked me how come [Father]'s not catching any fish. I said that's because he can't put that cell phone down long enough to catch any fish. And he said, f--- you, dad, pardon my French. And when he did that, I took my fishing rod and whacked him across the mouth with it.

Q. He was a teenager at the time, he was a minor?

A. He was 16, 17 years old.

\*\*\*

THE COURT: Do you think you would use those methods today?

THE WITNESS: No.

THE COURT: Why not?

THE WITNESS: I would say those would be considered somewhat abusive today.

THE COURT: So it's just because society has changed that you've changed your mind?

THE WITNESS: No, sir. I agree it should not have happened.

In April 2018, the Trial Court entered its detailed final judgment, finding and holding as follows, in relevant part:

5. [E.Z.] was enrolled at KinderCare and began attending there on or about October 7, 2015. At that time, she was just over one year old. There were no serious injuries to [E.Z.] or complaints by [Father] or [Mother] about any care provided to [E.Z.] at KinderCare until after the Department of Children's Services ("DCS") became involved with the family after [B.G.]'s injuries in June 2016.

6. [B.G.] was enrolled at KinderCare on or about April 5, 2016. He began attending daycare there shortly thereafter. At that point in time, he was just over one month old. Mother testified that she went back to work

six to eight weeks after [B.G.]'s birth. The first record of actual attendance is an "Incident / Accident Report" dated April 18, 2016 indicating that "When [B.G.] was getting his diaper changed, a bruise was noticed on his right leg." That incident slip was signed by [Mother].

7. [B.G.]'s medical records from his pediatrician were not entered into evidence. They were made available to Dr. Marymer Perales, the expert who testified concerning [B.G.]'s medical issues and the injuries that led to his removal from the care and custody of his parents. [B.G.]'s medical records from Children's Hospital were entered as Exhibit 3.

8. Exhibit 3 shows that [B.G.] was seen at Children's Hospital on the following dates and for the indicated treatments.

3/22/16 — Treatment of right perirectal abscess. Seen and treated in the Emergency Department and discharged.

4/10/16 — Treatment of recurrent right perirectal abscess. Seen and treated in the Emergency Department, discharged with a prescription for Augmentin, home treatment of abscess, and a follow up appointment with surgical specialist.

5/4/16 — Child was brought to ED after referral from pediatrician. May 4, 2016 was a Wednesday. Dr. Perales testified and the Court finds that on May 4, 2016, [B.G.] was taken by Mother to his regular pediatrician after being informed by daycare that [B.G.]'s diaper had contained some blood. [B.G.]'s pediatrician found that the tip of [B.G.]'s penis had sustained an injury. The tip of the penis was bruised and petechiae (capillaries that have burst due to pressure) were observed. This injury is not common in infants (Dr. Perales testified that she can see it during toilet training). It indicated to her that the child had been intentionally injured.

[B.G.]'s pediatrician sent Mother and child to Children's Hospital immediately. The doctors there ordered a head ultrasound (to rule out brain injury) and a full skeletal X-ray was taken. On that day no other injuries to [B.G.] were patent on the ultrasound or X-ray.

6/2/16 — Surgical intervention for recurrent anal abscess. Patient was discharged to parents that day. There were no complications or issues with surgery noted.

6/13/16 — Mother was called by daycare and informed that there was "blood" on [B.G.]'s bottle. Mother took the child to his pediatrician who noted that the child's frenulum (the strip of skin by which the upper lip is attached to the gums) was torn. Father and Mother noted that they had seen bleeding on his gums on Thursday evening (June 9, 2016). Father and Mother talked to their parents who indicated that it could be from teething. In a child [B.G.]'s age (non-mobile), a torn frenulum is an injury indicative of abuse. On June 13, 2016, [B.G.] was three months . . . old. He would

maybe be able to roll over, but was not crawling, walking, or standing. Given the force needed, the child could not have injured himself, and an adult should be able to state when and how the injury occurred. The pediatrician referred the parents and [B.G.] to Children's Hospital.

At Children's Hospital, the child was given a second head ultrasound that was clear and a skeletal survey was taken. The initial reading of the skeletal survey was deemed to be clear. However, it was re-read overnight by a pediatric radiologist who noted that there was "evidence of a corner type fracture involving the medial aspect of the metaphysis of the distal left femur. In addition, there is a lucency having a transverse orientation involving the medial aspect of the metaphysis of the proximal left tibia.["] The radiologist's report and Dr. Perales both state that these fractures are typical in "non-accidental" trauma. This fracture takes a pulling and/or twisting of the leg with more force tha[n] the child could exert. The Court finds that child's sibling could not have exerted sufficient force to cause these injuries.

6/14/16 — [B.G.] was ordered to return to Children's Hospital due to the finding of leg fractures upon the re-reading of the x-rays taken the day before. An additional CTs of his head and abdomen were taken that were normal. Mother told hospital staff that [B.G.] had been home with her, father and sibling or at daycare. The Children's Hospital records also indicate that she said [B.G.] had been left with no babysitters. [B.G.] was released to his parents. The parents were instructed to follow up with [B.G.]'s pediatrician for aftercare and to return in two weeks for a follow up with Children's Hospital so that repeat x-rays could be taken.

6/24/16 - The skeletal x-ray series was repeated on this visit. In addition to the healing fractures in his left leg, [B.G.] was found to have a healing posteromedial aspect of the right tenth rib. The notes from Children's Hospital social work interview indicate that Mother questioned daycare staff and she had been satisfied that no one there harmed him. On this day, Mother states that the child had been with multiple caregivers, Father, and grandparents. Dr. Perales stated that this type of injury to the rib is caused by a squeeze or similar force being exerted on the child such as in shaken baby syndrome or when CPR is performed. It was not accidental, caused by normal parenting activities such as swaddling, or the result of the child's actions.

The Children's Hospital Emergency Note for June 24, 2016 notes that there is "some concern that he [B.G.] had suffered abuse at daycare. The patient has still been going to daycare." Mother did not question the daycare about [B.G.]'s injuries after June 14. Mother did not disclose to the daycare that [B.G.] had leg fractures until she picked [B.G.] up on June

-20-

24 for the follow up skeletal survey. Mother's comment to KinderCare staff as she picked up [B.G.] on that day was the first indication to them he had any broken bone. [B.G.] was discharged from the hospital to the care of [Paternal Grandparents], pursuant to an agreement between DCS, his parents, and [Paternal Grandparents]. [E.Z.] was removed from her parents and placed with [Paternal Grandparents].

9. Dr. Marymer Perales testified as an expert regarding pediatric injuries and abuse. The Court found her to be credible and her opinions were not impeached. In referring to her testimony in this case within this Order, the Court is finding those opinions to be established facts. Dr. Perales is employed by Children's Hospital as a hospitalist, and she treats children who have been admitted to the hospital as a result of illness, trauma, or following surgical treatment. She has had additional training in recognizing and diagnosing childhood injuries and determining whether they are related to or arise from abuse. It is part of her job duties with Children's Hospital to consult with Emergency Department physicians regarding cases in which they have a concern that injuries are the result of non-accidental trauma (abuse). In addition to reviewing the medical records from [B.G.]'s pediatrician office, Dr. Perales spoke with the Emergency Department doctors and reviewed the records of the hospital.

After being asked whether [B.G.]'s torn frenulum could have been the result of a toy thrown by his sister, Dr. Perales indicated that the injury could not have resulted that way. Instead she testified it was likely caused by a forceful attempt to insert a pacifier or bottle into [B.G.]'s mouth while his mouth was closed. There was no testimony that [B.G.]'s sister had been involved with giving [B.G.] a pacifier or bottle where force had been an issue. When asked whether [B.G.]'s penile bruise was consistent with circumcision, Dr. Perales stated it was not, even though she did not know the date of circumcision. Dr. Perales testified that the penile injury was the result of someone grabbing or squeezing [B.G.]'s penis. The burst capillaries were the result of the force applied.

Based upon her training, Dr. Perales ruled out, through genetics, the results of blood work, and her review of [B.G.]'s x-rays, any medical cause for [B.G.]'s bruising or broken bones. Mother is noted on June 14 or 24 as continuing to assert to Children's Hospital staff that there has to be a medical reason for [B.G.]'s fractures, even after being told that [B.G.]'s injuries were the result of trauma. While testifying, Dr. Perales opined that [B.G.]'s leg fractures were not caused by his own movements, even if his leg were caught in his crib's railing, and the fractures were not caused by his sister pulling on his leg while in his crib. The injuries required

significant pulling or twisting force to cause the fractures observed in [B.G.]'s femur and tibia.

The age (i.e. when they occurred) of [B.G.]'s leg fractures could not be established based on the x-rays taken June 13 and June 24. Little change is noted in the condition of the fractures on the x-rays taken 11 days apart. Dr. Perales testified that the healing progression of that type of break is not known by her. Dr. Perales could and did state her opinion regarding the age of the rib fracture. [B.G.]'s rib fracture was no older than ten to fourteen days when the x-ray was taken on June 24, 2016.

Dr. Perales opined that [B.G.]'s leg fractures were not caused by the position in which he was placed for the procedure he underwent on May 2, 2016 to correct his perirectal abscess. Dr. Perales stated that the child would have been anesthetized before his legs were raised and secured. Due to [B.G.]'s unconsciousness, he would not have resisted his legs being positioned for the surgery and little force would therefore have been necessary. In addition, Dr. Perales stated that this surgical position is commonly used and has not, in her experience, resulted in fractures such as the ones sustained by [B.G.].

Dr. Perales says that the rib and leg fractures would have caused [B.G.] significant pain at the time they occurred. A person in [B.G.]'s presence would have heard him cry in a manner different than his "normal" cries (hungry, wet, or tired). After the fractures occurred, [B.G.] would not likely have been symptomatic (experienced or expressed pain) unless the area was touched or manipulated while a caregiver was holding [B.G.], dressing him, or changing his diapers.

10. At trial, the parents provided details about the amount of time that [B.G.] and [E.Z.] spent with their respective parents. Although some of the caregiving by either set of grandparents was within the time frame during which Dr. Perales indicated that [B.G.]'s injuries could have been incurred, the Court finds that the great weight of care for [B.G.] was provided for by Mother or Father. The Court finds that the grandparents who admitted providing care for [B.G.] during the critical time periods were credible in their denials of harm.

The Court finds that the child's daycare and the caregivers there were not the cause of [B.G.]'s injuries. At trial, the parents expressed the belief that daycare may have been where [B.G.] was injured. That belief was formed after the Juvenile Court trial based upon records introduced into evidence, rather than based upon how events unfolded. The Court finds that the parents' "after the fact" finger pointing at daycare is unjustified. Had the parents felt that the child was being injured at daycare, they would have reported the broken bones to daycare on June 14, 2016 and

-22-

not have returned the child to daycare between then and June 24, 2016 when [B.G.] was removed from parent's custody by DCS. Further, they would not have allowed [E.Z.] to remain at the facility.

11. Until just before the trial de novo, Mother and Father were still residing together. Mother denied ever seeing Father act out angrily. Both parents testified that the relationship was over, but their testimony was not credible.

10. There is no question that [B.G.] has been the victim of abuse as defined by Tenn. Code Ann. § 37-1-102(b)(1). The Court finds the evidence to be clear and convincing that he has suffered three broken bones, sustained an injury to his penis, and endured a torn frenulum. These injuries were caused by physical force as the result of the actions of a parent, relative, guardian or caretaker.

11. The Court cannot find, by clear and convincing evidence, that there has been severe child abuse as defined by Tenn. Code Ann. § 37-1-102(b)(22). The medical proof concerning the date of injury is insufficient to place [B.G.] in any specific caregiver's care at the time of the leg fractures or the rib fracture. The proof establishes that [B.G.] was in the care of his parents before he received the penile injury and when the torn frenulum were first noted. While the Court finds by clear and convincing evidence that those injuries occurred while [B.G.] was in the care of his parents, the Court cannot, due to each parent's claimed ignorance of how [B.G.] received any of his injuries, find one or the other responsible.

The Court holds that there is not sufficient proof to find by clear and convincing evidence that one parent or the other had "actual knowledge" of the relevant facts concerning the abuse of [B.G.] as required by the definition of severe abuse in Tenn. Code Ann. § 37-1-102(b)(22). Further, the Court cannot determine by clear and convincing evidence whether one or both parents are responsible for [B.G.]'s injuries.

12. Due to the injuries sustained by [B.G.] in the parents' care, the Court finds, by clear and convincing evidence, that he and his sister are dependent and neglected as defined by Tenn. Code Ann. § 37-1-102(b)(11)(B), (C), (F), and (G).

13. The Court finds that it is in the best interests of [E.Z.] that legal and physical custody of her be awarded to her maternal grandfather and step-grandmother, [Maternal Grandparents]. The Court finds that is in the best interests of [B.G.] that legal and physical custody of him be awarded to his paternal grandfather and step-grandmother, [Paternal Grandparents].

14. The Court finds by a preponderance of evidence that one or both parents are responsible for the injuries sustained by [B.G.]. The overwhelming majority of the time that the child was not in daycare was

spent with one or both parents. The Court finds that both parents know which of them harmed this child. The parent who harmed the child knows that he or she caused the injuries. The other parent knows that he or she did not, and that it must have been the other parent.

15. The Court finds that Father lacks credibility. Over the course of the past two years, he has lied repeatedly to Mother about having a job and going to work. He has also lied to his parents regarding the same issues. Father's testimony on the stand was marked by his defensive and irritated demeanor. Father took no responsibility for his own actions and instead testified that he felt "betrayed" by his father's ([J.G.]'s) honest testimony about an incident of violence between [Father] and a girlfriend, [Father]'s own altercation with his Father, Father's lies to him concerning whether or not Father was working, and [J.G.]'s belief that Father was capable of harming [B.G.]. Despite denying that he has acted out angrily since the incident with his girlfriend a number of years ago, Father, after being told by Mother that he needed to get his act together or they were through, punched the dashboard of her car breaking the stereo. Due to Father's responses to the evaluation in which Father was required to participate by the Juvenile Court Order, the Court does not find the evaluation to be credible or to present an accurate representation of Father's current situation.

As a result, Father shall not have unsupervised contact with the children, [E.Z.] or [B.G.], until Juvenile Court finds that he does not represent a risk of harm to the children. Father's co-parenting time must be supervised (physical presence in actual sight) by a member of his family [Paternal Grandparents] or Mother's family, [Maternal Grandparents]. Father's co-parenting shall not be supervised by Mother at any point in time until Juvenile Court has removed the requirement that his co-parenting time be supervised.

16. Mother makes a more credible witness than Father. She has been employed and in school regularly. She promptly completed the Juvenile Court's requirements. The Court has similar issues about the results of Mother's evaluation given that she listed the reason for the assessment as "DCS case, allegations of severe abuse at daycare." Mother has not yet demonstrated that she is able to protect her children from what the Court finds is an actual risk of harm. Mother remained in a relationship with Father despite his failure to work and his failure to contribute to her and the children's support. Mother overlooked a serious indicator that Father has poor anger management (punched dashboard and the resulting broken radio). In addition, Mother's DUI arrest (conviction for reckless driving) during the pendency of this matter causes the Court concern about

-24-

her maturity and her decision-making ability. The Court finds [J.G.]'s testimony about another episode of Mother's drinking while she had care of the children to be credible. Mother also seems to be uncertain regarding her relationship with Father. She testified that their relationship was over, but also testified that she was aware of his plans for couple's counseling in the near future. Her testimony contradicts itself and cannot be reconciled. In light of Father's testimony that Mother and he broke up for the purposes of this trial, the Court finds that Mother and Father's relationship has not ended.

Mother's time with [B.G.] shall remain supervised until [B.G.]'s fourth birthday . . . . At that time, the need for supervision shall be lessened due to [B.G.]'s physical maturity and verbal ability to inform caregivers in the event he were to sustain an injury, accidental or otherwise. Supervision of Mother's co-parenting time shall be done by her family members ([Maternal Grandparents]), or her natural mother, ([C.F.]) or by [Paternal Grandparents]. [E.Z.] turns four in October of this year. At that time, Mother may begin unsupervised co-parenting time with [E.Z.] for periods of up to four hours. After a period of six months, Mother's unsupervised periods shall be extended to eight hours. Mother may not allow Father to see [E.Z.] during her unsupervised co-parenting time. Following [B.G.]'s fourth birthday, Mother's co-parenting time with him shall follow the graduated process used for [E.Z.].

17. It is important for [E.Z.] and [B.G.] to continue to have time with one another so that their sibling relationship and the relationship between the children and both sets of grandparents is maintained. The parties shall continue their current practice of having the children spend time with one another during Mother and Father's supervised co-parenting time as well as at times other than when Mother and Father are exercising supervised co-parenting time.

DCS timely appealed to this Court.

## Discussion

This appeal features multiple parties with several overlapping issues. DCS, technically the appellant, raises the issue of whether the Trial Court erred in declining to find severe child abuse. Otherwise, DCS supports affirmance of the Trial Court's judgment. Paternal Grandparents share DCS's position, but argue only with respect to B.G. Maternal Grandparents, on the other hand, assert that the Trial Court was correct in declining to find severe child abuse but argue further that the Trial Court erred in finding the Children dependent and neglected. According to Maternal Grandparents, the

Children should return to Mother's care, but, barring that, the Children should be united in their custody. Mother likewise challenges the Trial Court's finding of dependency and neglect and its disposition for the children. Mother argues specifically that the paternal grandfather, J.G., is ill-suited to have custody of B.G. Father did not file a brief on appeal.

We, therefore, have identified the following three distinct, dispositive issues: 1) whether the Trial Court erred in finding the Children dependent and neglected; 2) whether the Trial Court erred in declining to find severe child abuse; and, 3) whether the Trial Court erred in its custody disposition.

The burden for dependency and neglect and severe child abuse cases has been articulated as follows:

> [D]ependency and neglect must be established by clear and convincing evidence. Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established.

*In re S.J.*, 387 S.W.3d 576, 587 (Tenn. Ct. App. 2012) (internal citations and quotation marks omitted).

We first address whether the Trial Court erred in finding the Children dependent and neglected. The Trial Court found the following statutory definitions of a dependent and neglected child to apply:

> (B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;

> (C) Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

\*\*\*

-26-

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G) Who is suffering from abuse or neglect;

Tenn. Code Ann. § 37-1-102 (b)(12) (2014).[2]

B.G. suffered not one but a series of injuries. B.G. incurred three broken bones, a bruised penis, and a torn frenulum. The uncontroverted medical evidence is that these injuries were non-accidental in origin. A number of caregivers looked after B.G. in the time frame in which these injuries occurred. The Trial Court heard the evidence at trial and determined that B.G.'s non-parental caregivers were not responsible for B.G.'s injuries. In contrast, the Trial Court did not credit Mother's and Father's denials, stating in its order:

> The Court finds by a preponderance of evidence that one or both parents are responsible for the injuries sustained by [B.G.]. The overwhelming majority of the time that the child was not in daycare was spent with one or both parents. The Court finds that both parents know which of them harmed this child. The parent who harmed the child knows that he or she caused the injuries. The other parent knows that he or she did not, and that it must have been the other parent.

The evidence does not preponderate against these findings, nor is there any basis for overturning the Trial Court's credibility determinations. Mother's and Father's testimony was prevaricating at best. The record is full of examples. Mother stated that she and Father no longer were together, but also that they were engaging in couples counseling and, as found by the Trial Court, were living together right up until trial. The testimony reflects that Mother at trial persisted in casting blame toward daycare but she continued to take B.G. to the same daycare after being informed of his injuries. She evidently had no concerns about daycare, or anyone else in B.G.'s extended network of caregivers. Another instance of Mother's poor credibility was revealed when she was questioned about Father's steroid use. When asked if she knew whether Father was taking steroids when B.G. sustained his injuries, Mother testified: "He was not taking steroids at the time that [B.G.] sustained these. He had been off of them for a month, which everyone in this courtroom knows, he had been off of them for a month." This is, at the very least, odd phrasing given Mother's position that she does not know how or

---

[2] This statute and others in the dependency and neglect and severe child abuse statutory scheme have been amended since the events of this case. However, the relevant provisions remain the same. There is no dispute as to the applicable legal standards.

when B.G. sustained his injuries. Moreover, why would "everyone" in the courtroom know when Father stopped taking steroids? Time and again, the basis for the Trial Court's credibility determination is easy to see. While the Trial Court found Mother more credible than Father, it did not find her credible on the whole.

For her part, Mother points out that she never failed to seek medical attention for B.G. when someone else would call her attention to the injury. Mother argues also that B.G.'s injuries effectively were unnoticeable. Mother's history of seeking medical attention for B.G. certainly is good but not decisive. That a parent complicit in child abuse afterwards seeks medical attention for the abused child once the injury is noticed by a third party does not absolve that parent of responsibility. As to the noticeability of B.G.'s injuries, the fact that they were difficult to see does not detract from their severity, and, based on the medical evidence presented at trial, we do not believe Mother could have missed B.G.'s reaction to being hurt so badly. This is especially so as Mother was B.G.'s primary caregiver and the Trial Court found that "[t]he overwhelming majority of the time that the child was not in daycare was spent with one or both parents."

As to Father, he is not an active participant in this appeal, but his presence looms large over the case. The Trial Court noted his history of lying about being employed. In addition, the Trial Court noted his "defensive" and "irritated" demeanor in the courtroom. This record contains examples of Father's explosive anger, including breaking the radio in a car because he was told something he did not like. As found by the Trial Court, Father is not believable.

Even were the Trial Court or this Court to accept Mother's and Father's denials at face value, the uncontroverted evidence is that B.G. kept on receiving serious non-accidental injuries in their care. The parents' mechanical professions of ignorance are insufficient. The bottom line is Mother and Father could or would do nothing to prevent these injuries that kept cropping up. For B.G.'s sake, the status quo could not continue. Notably, B.G. has not received similar sorts of injuries while in the care of Paternal Grandparents, and he is developing well. We find and hold, as did the Trial Court, there is clear and convincing evidence that the Children were dependent and neglected.

Having affirmed the Trial Court's finding of dependency and neglect, we next address whether the Trial Court erred in declining to find severe child abuse. Despite finding that one parent abused B.G. and the other knew of that abuse, the Trial Court stated: "While the Court finds by clear and convincing evidence that those injuries occurred while [B.G.] was in the care of his parents, the Court cannot, due to each parent's claimed ignorance of how [B.G.] received any of his injuries, find one or the other responsible." We next look to the statutes and relevant cases to determine whether the Trial Court's legal conclusion was in error.

-28-

"Severe child abuse" means: "The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death; ..." Tenn. Code Ann. § 37-1-102(b)(21)(A)(i) (2014). "Serious bodily injury" means:

> "Serious bodily injury to the child" includes, but is not limited to, second-or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(c)(2018).

This Court has elaborated on the standard of review in severe child abuse cases as well as the effect of a parent's denial of abuse:

> Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.
>
> It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver.

*In re S.J.*, 387 S.W.3d at 592.

In another case, we addressed a scenario where a very young child was abused, and the parents offered no explanation:

Mother and Father each argue that they did not abuse the Child, they have no actual knowledge of what happened to the Child, and that there were no "visible signs or specific reasons" that would place them on notice that someone else had abused the Child, and, therefore, they did not knowingly expose the Child to abuse or fail to protect the Child from abuse.

\*\*\*

The evidence clearly shows that there were sufficient facts presented to these parents from which, at a minimum, each could have, and should have, recognized that severe child abuse had occurred or that it was highly probable that it would occur. The Child's injuries, which occurred while the Child was very young, were multiple, very serious, inflicted on separate occasions with great force, and not self-inflicted or accidentally inflicted.

*In re N.T.B.*, 205 S.W.3d 499, 506-07 (Tenn. Ct. App. 2006).

Mother's and Father's denials, by themselves, are not dispositive of anything. B.G.'s injuries fit within the definition of serious bodily harm necessary to sustain a finding of severe child abuse. The Trial Court found that "one or both parents are responsible for the injuries sustained by [B.G.]" and that "both parents know which of them harmed this child." As discussed above, we find that the evidence does not preponderate against these findings. The combined weight of the Trial Court's findings clearly and convincingly shows severe child abuse. It is, therefore, unclear why the Trial Court did not go further and render a finding of severe child abuse given that the evidence is clear and convincing as to the severe child abuse. We need not identify which parent physically applied the violent force necessary to inflict the injuries on B.G. because, in view of the medical evidence, other facts as found by the Trial Court, and the Trial Court's credibility determinations, there were sufficient facts presented to Mother and Father from which, at a minimum, each could have and should have recognized that severe child abuse had occurred or that it was highly probable to occur and that the other parent was the abuser.

We emphasize that the burden of proof as to severe child abuse is clear and convincing evidence. While a serious subject matter with important implications for the parents and children, this is not a criminal matter. The burden of proof is not "beyond a reasonable doubt." Clear and convincing evidence is a higher threshold than a preponderance of the evidence but it is less than beyond a reasonable doubt. On this record, we have no serious or substantial doubt that the combined weight of the facts as found by the Trial Court, against which the evidence does not preponderate, establishes severe child abuse by clear and convincing evidence. We reverse the Trial Court as to

-30-

this issue. We hold that the evidence clearly and convincingly establishes that Father or Mother subjected B.G. to severe child abuse and that the other parent covered for the other rather than protect B.G. from the severe child abuse.

The final issue we address is whether the Trial Court erred in its custody disposition for the Children. When a court determines that a child is dependent and neglected, it proceeds to render a "disposition best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a)(Supp. 2018). The court may permit the child to stay with his or her parents, guardian, or other custodian, or transfer temporary legal custody to an individual "qualified to receive and care for the child" or to DCS. Tenn. Code Ann. § 37-1-130(a)(1) & (2)(Supp. 2018).

Maternal Grandparents argue that B.G. and E.Z. should be united in their care, as opposed to B.G. being cared for separately by Paternal Grandparents. Mother argues that J.G., the paternal grandfather, is unsuitable because he has acted violently toward his own son in the past and B.G. has been injured a few times in the grandfather's care.

First, there is no suggestion that the injuries B.G. sustained in J.G.'s care are of an abusive sort. Mother did not lose custody of the Children because B.G. received routine bumps and bruises as part of a child's normal growth. She lost custody because of severe, non-accidental injuries B.G. sustained in her care. Regarding J.G.'s parenting of Father, the disciplinary methods he testified to having used in the past are inappropriate. However, he testified also that he would not employ those disciplinary techniques in the future, which the Trial Court clearly believed.

As to the question of reunification of the Children, the Trial Court found that the better disposition would be for B.G. to remain with Paternal Grandparents and E.Z. with Maternal Grandparents. Based on this record, the Children are in good, stable households where their best interests are advanced. Because the Trial Court factored in the desirability of B.G. and E.Z. spending time with one another in its final judgment, the Children will continue to see one another. We affirm the Trial Court's custody disposition.

In summary, we reverse the Trial Court as to its declining to find severe child abuse, and we hold that the evidence in the record clearly and convincingly establishes that Father or Mother subjected B.G. to severe child abuse with the other's knowledge. We affirm the Trial Court as to its finding the Children dependent and neglected, and as to its disposition for the Children. Because we have found severe child abuse, on remand the Trial Court is to revisit the parents' visitation schedule with the Children in accordance with any applicable restrictions.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed one-half equally between the Appellee S.Z. and the Appellees J.Z. and C.Z.

_____
D. MICHAEL SWINEY, CHIEF JUDGE